UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

MICHAEL OSGOOD,

                              Plaintiff,

            -against-

CITY OF NEW YORK, BILL DE BLASIO, Individually,
JAMES O'NEILL, Individually, TERENCE MONAHAN,
Individually, DERMOT SHEA, Individually,
ANN PRUNTY, Individually, JOHN DONAHUE, Individually,
JAMES ESSIG, Individually, and RAYMOND SPINELLA,
Individually,

                              Defendants.

-------------------------------------------------------------------------------X

**AMENDED COMPLAINT**

21 CV 9460
(JPC) (OTW)

<u>Jury Trial Demanded</u>

        Plaintiff MICHAEL OSGOOD, by his attorneys, Brett H. Klein, Esq., PLLC, complaining of the defendants, respectfully alleges as follows:

## <u>Preliminary Statement</u>

        1.      Plaintiff brings this action for compensatory, economic, and punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitution the United States.

        2.      Plaintiff, a former New York City Police Department (hereinafter "NYPD") Deputy Chief, was retaliated against for his role in helping to expose the systemic problems in the NYPD's handling of special victims cases.  Mr. Osgood, who was the City-wide Commander of the NYPD's Special Victims Division (hereinafter "SVD"), and the Hate Crimes Task Force (hereinafter "HCTF") brought thirty-four years of law enforcement expertise and innovation to his position with SVD.  During his tenure, Mr. Osgood uncovered serious and pervasive flaws

impacting the SVD, which he first tried to remedy internally, and then truthfully relayed to the Office of the Inspector General for the NYPD (hereinafter "OIG-NYPD") in sworn testimony, despite orders to withhold information known to him.   Instead of being honored for his exemplary service and dedication to improving the investigation of sexual assault victim complaints and the treatment of sexual assault victims, Mr. Osgood was ostracized, demoted, and constructively fired in retaliation for exercising his First Amendment rights through truthful testimony to the OIG-NYPD regarding systemic failings impacting the NYPD's handing of special victims.

## JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First Amendment to the United States Constitution.

4.      Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

5.      Venue is properly laid in the Southern District of New York under 28 U.S.C. § 1391(b), in that this is the district in which the claim arose.

## JURY DEMAND

6.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Plaintiff MICHAEL OSGOOD is a resident of Staten Island, New York.

8.      Mr. Osgood was employed as the Commanding Officer of the NYPD's SVD from 2010 to 2018.

9.      Defendant CITY OF NEW YORK was and is a municipal corporation duly

organized and existing under and by virtue of the laws of the State of New York.

10.     Defendant CITY OF NEW YORK maintains the New York City Police Department (hereinafter referred to as "NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, CITY OF NEW YORK.

11.     Defendant BILL DE BLASIO was, at all times relevant to this Complaint, Mayor of the City of New York and had final policymaking authority with respect to the NYPD and was further responsible for appointing Commissioner JAMES O'NEILL.

12.     Defendant JAMES O'NEILL was, at all times relevant to this Complaint, the Police Commissioner for the NYPD and had final policymaking authority with respect to the NYPD.

13.     Defendant TERENCE A. MONAHAN was, at all times relevant to this Complaint, the Chief of Department for the NYPD.

14.     Defendant DERMOT SHEA was, at all times relevant to this Complaint, either Chief of Crime Control Strategies or Chief of Detectives for the NYPD.

15.     Defendant ANN PRUNTY was, at all times relevant to this Complaint, the Assistant Deputy Commissioner for NYPD's Legal Bureau.

16.     Defendant JAMES ESSIG was, at all times relevant to this Complaint, an Assistant Chief of Detectives for the NYPD.

17.     Defendant JOHN DONAHUE was, at all times relevant to this Complaint, Chief of the Office of Management Analysis and Planning for the NYPD.

18.     Defendant RAYMOND SPINELLA was, at all times relevant to this Complaint, the NYPD Chief of Staff.

19.     That at all times hereinafter mentioned the defendants, either personally or

3

through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

20.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant CITY OF NEW YORK.

## **FACTS**

21.     While acting under color of law and by way of authority and power granted to them by the City of New York, the defendants, their agents, officers, servants and/or employees, engaged in unlawful conduct by retaliating against plaintiff for exercising his First Amendment right to free speech by creating a hostile work environment, engaging in harassing speech directed toward plaintiff, and taking adverse employment actions against plaintiff.

22.     The unlawful, harassing and retaliatory behavior on which this action is based commenced in or about March 2017 and was constant, persistent, pervasive and continuing in nature, up until on or around August 11, 2020, the date on which plaintiff was constructively terminated.  During this time, plaintiff was retaliated against for giving truthful testimony and speaking to the press, speech which is protected by the First Amendment, and which was engaged in as a citizen and not pursuant to Mr. Osgood's duties as a police officer.

**Mr. Osgood's History in SVD**

23.     Mr. Osgood came to his position in the SVD after 25 years of exemplary service as a law enforcement officer with the NYPD, where he began as a police officer in 1984 and rose quickly and steadily through the ranks, serving as a sergeant, a lieutenant, an inspector, and captain.    In 2008, Mr. Osgood was named Commanding Officer of the SVD.

24.     SVD is a City-wide division based in Manhattan which investigates sex crimes and cases of alleged child abuse.  The SVD works in partnership with victim advocates and other city agencies such as the Administration for Children's Services.

25.     During his tenure at the NYPD, Mr. Osgood developed, managed, and implemented a number of innovative law enforcement techniques and systems.  For example, Mr. Osgood implemented ten new organizational units within the SVD, designed and implemented the Investigative Process Improvement Group (IPIG) to improve detective work, and created a Division Operational Mental Model to drive investigative operational decisions.

26.     In November 2013, Mr. Osgood was directed by then-Chief of Detectives, Phil T. Pulaski, to construct a PowerPoint presentation on the problems facing the SVD with a focus on staffing.  Over the next eight weeks, Mr. Osgood constructed a PowerPoint detailing serious external systemic factors damaging SVD investigations.

27.     The PowerPoint was completed on January 12, 2014, one week before Chief Pulaski retired from the NYPD.

28.     Also in January 2014, the New York City Council established the OIG-NYPD, part of the New York City Department of Investigation an official statutory investigative body of the City of New York, with arrest and subpoena powers.

29.     In February 2014, Mr. Osgood met with the new Chief of Detectives, Robert Boyce, to brief him on major open SVD cases.  Mr. Osgood also informed Chief Boyce of serious systemic problems impacting SVD and provided Chief Boyce a copy of the January 12, 2014, PowerPoint on SVD staffing Issues which detailed these systemic problems.

5

30.     Further, during this time, Mr. Osgood forced over a dozen multi-hour long senior executive meetings detailing serious external systemic factors damaging SVD investigations, victims, and placing front-line detectives in jeopardy.

31.     These senior executive meetings were with Chief Boyce and then Chief of Crime Control Strategies defendant DERMOT SHEA, among others.

32.     Mr. Osgood was an ongoing vocal advocate for increasing staffing numbers, improving training, and fighting for a dedicated squad of experienced investigators to be made available to SVD to adequately deliver effective investigative services to victims of sexual violence.

33.     Mr. Osgood's efforts were overwhelmingly ignored.

**OIG-NYPD's Investigation of SVD which Sparked the Retaliatory Conduct**

34.     On or about January 2017, a NYPD commanding officer made comments at a Precinct Community Council meeting when questioned about an increase of rapes during the preceding twenty-eight-day period stating: "It's not the trend we're too worried about because out of thirteen, only two were stranger rapes.  If there's a true stranger rape, a random guy picks up a stranger off the street, those are the troubling ones. That person has, like no moral standards.  They're not total-abomination rapes where strangers are being dragged off the streets."

35.     The statements went viral across the country and were covered by many different news media outlets, and ultimately contributed to the OIG-NYPD commencing an investigation into the NYPD's SVD Adult Squad's operations.

36.     On March 2, 2017, Mr. Osgood was directed to attend a pre-OIG-NYPD

investigation meeting in the NYPD Legal Bureau's conference room on March 3, 2017.

37.     In attendance at the March 3, 2017, meeting from the NYPD Legal Bureau were, without limitation, defendant Assistant Deputy Commissioner (hereinafter "ADC") ANN PRUNTY.

38.     Mr. Osgood brought with him to the meeting and provided to defendant ADC PRUNTY documents detailing the external systemic problems that was damaging special victim's investigations, and Inspector General Reports of other cities' investigations of their respective police department's special victims' operations, and several Department of Justice consent decrees placed on other police department's special victims operations.

39.     Mr. Osgood informed defendant ADC PRUNTY that there were serious problems with SVD.

40.     Thereafter, over the next hour of the meeting, defendant ADC PRUNTY, along with other members of the Legal Bureau, directed Mr. Osgood and his staff in attendance to obstruct, frustrate, slow down and to not fully cooperate with the OIG-NYPD investigation of SVD.

41.     In particular, they were told that when interviewed by the OIG-NYPD, they should give one-word answers, act like it's a deposition, not bring any documents to the OIG meetings, and that if the OIG in the future asks for additional data or documents, that they should "slow walk" that request and not to talk to them on the outside.

42.     Thereafter, in March 2017, Mr. Osgood had his first of several meetings with OIG-NYPD.

43.     Members of the NYPD Legal Bureau were also in attendance.

44.     During the meeting, Mr. Osgood did not heed defendant ADC PRUNTY's directives, and instead, out of concern for, and in the interest of ensuring that sexual assault victims receive the justice they deserved, provided complete and truthful responses to all OIG-NYPD questions, and directed members of his staff to do the same.

45.     Further, during the meeting, Mr. Osgood was asked whether CompStat hurt SVD investigations.  Mr. Osgood honestly answered in the affirmative that CompStat damages both SVD investigations and victims.

46.     Defendant ADC PRUNTY immediately interrupted and ended the meeting and thereafter rebuked and scolded Mr. Osgood for giving complete answers and allowing the meeting to go past and hour in time.

47.     Defendant ADC PRUNTY also informed Mr. Osgood that his career would be in danger if he speaks badly about CompStat.

48.     Sometime in May 2017, defendant ADC PRUNTY forwarded to Mr. Osgood the first official document request issued by OIG-NYPD to the NYPD's Legal Bureau.

49.     Upon forwarding it to Mr. Osgood, ADC PRUNTY directed Mr. Osgood both on the phone and via email to slow walk the response to the OIG-NYPD official request.

50.     Mr. Osgood instead completed a response to the OIG request within five days.

51.     The final work product was immediately forwarded to the Legal Bureau.

52.     On or about August of 2017, defendant Chief SHEA began excessive attacks on the SVD units at weekly CompStat meetings in response to Mr. Osgood being truthful in the OIG-NYPD interview meeting.

53.     Mr. Osgood complained to higher ups including Chief of Detectives Boyce

and Assistant Chief Patrick Conry requesting that defendant Chief SHEA stop because his actions were damaging investigations and victims.

54.    Also in August 2017, a second meeting was held with OIG-NYPD.  There was again a pre-meeting during which Mr. Osgood and his staff were ordered to obstruct the OIG-NYPD, shave their testimony, and informed that Mr. Osgood's career will be in danger if he spoke badly about any Department program.  Mr. Osgood was ordered to keep the meeting to one hour.

55.    The second meeting lasted approximately three hours, and during the meeting Mr. Osgood again fully cooperated and truthfully answered the OIG-NYPD questions.

56.    After the OIG-NYPD meeting, Mr. Osgood was again rebuked and scolded by defendant ADC PRUNTY for giving complete answers, for being truthful, and for allowing the meeting to go three hours.

57.    Defendant ADC PRUNTY again threatened Mr. Osgood stating, in sum and substance, that his career would be in danger, and again directed Mr. Osgood to slow walk any document requests that came out of the second meeting.

58.    On August 21, 2017, the OIG-NYPD issued its second official request letter to the NYPD's Legal Bureau.

59.    The request letter was not forwarded to Mr. Osgood until September 21, 2017.

60.    Mr. Osgood was told again by defendant ADC PRUNTY to slow walk the request.

61.    Mr. Osgood, however, completed the request within a week.  The requested information was sent to the Legal Bureau on September 30, 2017.

62.     Also, around this time, Mr. Osgood began to hear comments circulating that he had gone "outside the family" and that Mr. Osgood had somehow betrayed the NYPD.

63.     On January 8, 2018, the OIG-NYPD issued a third official document request for all of SVD's internal communications.

64.     Mr. Osgood again was ordered to slow walk the request.

65.     Mr. Osgood nonetheless completed the task in a few days and immediately sent the relevant documents to the Legal Bureau.

66.     Around this time, Mr. Osgood also informed defendant Chief of Department TERRANCE MONAHAN and Deputy Commission Susan Herman that the Legal Bureau was blocking the OIG-NYPD investigation and refusing to hand over key documents.

67.     Also in January 2018, defendant ADC PRUNTY informed Mr. Osgood that OIG-NYPD had requested to interview him again, but she had lied to OIG-NYPD, telling them Mr. Osgood was too busy.

68.     Thereafter, in February 2018, the OIG-NYPD issued to Mr. Osgood an Executive Order 16, compelling his appearance as a witness.

69.     A few days before Mr. Osgood was to appear as a compelled witness at the OIG-NYPD, defendant ADC PRUNTY ordered Mr. Osgood to appear in the Legal Bureau conference room for a one-on-one meeting.

70.     Also in the room, where two Sergeants from the NYPD OIG Compliance Unit.

71.     Defendant ADC PRUNTY entered the room in an aggressive and angry manner and was holding several of the internal communications DC Osgood had recently delivered to the Legal Bureau.

72.     During the meeting, defendant ADC PRUNTY attempted to dissuade, importune,

10

threaten, and to otherwise coerce Mr. Osgood not to give full disclosure to the OIG-NYPD.

73.     In response to defendant ADC PRUNTY's threats, Mr. Osgood stated that the OIG-NYPD is an official investigative body of the City of New York with arrest and subpoena power, clearly telling ADC PRUNTY he would not participate in any obstruction of OIG-NYPD.

**Mr. Osgood Provides Protected Truthful and Full Testimony to OIG-NYPD**

74.     In mid-February 2018, Mr. Osgood was interviewed for the third time by the OIG-NYPD, this time as a compelled witness and under oath for four hours.

75.     The NYPD Legal Bureau was not allowed to attend.

76.     Mr. Osgood's sworn testimony as a compelled witness was provided as a citizen and pursuant to his duty as a citizen to provide truthful testimony and to not perjure himself.

77.     Mr. Osgood's full and truthful testimony was regarding an issue of public concern, to wit: the treatment of victims by SVD, and he provided this full and truthful testimony despite repeated orders that he should withhold his prior reports and opinions regarding SVD failings, and despite threats of retaliation if he failed to comply with these directives.

78.     During the meeting, OIG-NYPD investigators showed Mr. Osgood approximately fourteen of the internal communications that Osgood delivered to the Legal Bureau in response to the OIG-NYPD document request.

79.     Mr. Osgood was asked questions, including how many internal communications he had given the Legal Bureau.

80.     Mr. Osgood replied thirty-two.

81.     Mr. Osgood was asked why only fourteen had been provided to the OIG-NYPD, to which Mr. Osgood replied, he did not know and to ask the Legal Bureau.

82.     Mr. Osgood was further asked if he ever received a response from the NYPD to

any of the memos he had prepared, to which he answered, no.

83.     The foregoing inquiry supports that the Legal Bureau was attempting to limit OIG-NYPD's access to full and truthful information.  Mr. Osgood's refusal to follow orders and provision of truthful testimony as a citizen aided in the truth coming to light.

84.     In mid-March of 2018, the OIG-NYPD issued an accurate report on the NYPD's SVD Adult Squad operations.  The report, which garnered negative nation-wide press confirmed, among other things, that the NYPD had routinely understaffed, both in number and experience, and undertrained investigators assigned to SVD, and generally neglected the SVD, and that these failures had negatively impacted sexual assault investigations.[a]

**The Ensuing Retaliation against Mr. Osgood for Being Truthful to OIG-NYPD**

85.     Thereafter, colleagues of Mr. Osgood relayed to him that he was being discussed within the Office of the Chief of Detective and that comments were being made including that Osgood betrayed the NYPD, Osgood went outside the family, Osgood will be disciplined, Osgood will get charges and specs, they will rip the SVD and HCTF Task Force (hereafter HCTF) away from Osgood to demoralize him, Osgood is going to be f#$%!d, Osgood initiated the investigation by going to the OIG-NYPD, Osgood gave his memos to the OIG-NYPD and Osgood should have destroyed his memos or denied their existence.

86.     Osgood was also informed that the Mayor's Office was seeking to replace him with a female officer.

87.     In response to the OIG-NYPD report on SVD, the New York City Council scheduled hearings to be held on April 9, 2018.

88.     In preparation for the hearings, the Police Commissioner's Office held over a

---

[a] *See An Investigation of NYPD's Special Victims Division—Adult Sex Crimes*, Mark G. Peters, Commissioner, Mar. 27, 2018, available at https://www1.nyc.gov/assets/doi/reports/pdf/2018/Mar/SVDReport_32718.pdf.

dozen prep meetings.  During one of the meetings that was attended by, among others, defendant Chief of the Office of Management Analysis and Planning JOHN DONAHUE and defendant Chief of Staff RAYMOND SPINELLA, Chief DONAHUE said to Mr. Osgood in an aggressive manner, "Mike fucking Osgood!" Mr. Osgood responded, "I didn't cause this." Chief DONAHUE replied, "Your fucking memos, you didn't have to give them your memos."

89.    On April 9, 2018, the New York City Council held the public hearing on the OIG-NYPD report on SVD.  NYPD executives openly stated almost everything in the report was wrong, in a further effort to hide the truth of SVD's grave issues from the public.

90.    On April 16, 2018, defendant SHEA was promoted to Chief of Detectives, replacing Chief Boyce.

91.    Prior to Boyce being replaced by defendant SHEA, Boyce told Mr. Osgood, in sum and substance, you may have to fight O'NEILL (referring to Commissioner JAMES O'NEILL) and City Hall, referring to defendant Mayor DE BLASIO, for your job.

92.    After the City Council hearing, the retaliation against Mr. Osgood for providing truthful testimony as a witness to the OIG-NYPD escalated further.

93.    Defendant Commissioner O'NEILL ordered and then conspired with, without limitation, defendant Chief MONAHAN, defendant Chief of Detectives SHEA, and defendant Assistant Chief JAMES ESSIG to undermine Mr. Osgood's reputation in an effort to oust Mr. Osgood from his position and in retaliation for his truthful and full cooperation with the OIG.

94.    Defendants embarked on this effort by engaging in a pre-textual investigation of SVD ordered by O'NEILL and led by ESSIG to gather false negative information regarding Mr. Osgood.

95.    Further, defendant SHEA embarked on a review of SVD data to try to drum up

negative stats in an attempt to denigrate Mr. Osgood.

96.     SVD was also excessively attacked in CompStat meetings and defendant Chief MONAHAN made statements to the CompStat unit that he "wanted" Osgood.

97.     In early May 2018, defendant Assistant Chief ESSIG asked Mr. Osgood if he lived in Staten Island.  Defendant ESSIG's question was out of the ordinary and foretold Mr. Osgood's eventual demotion, and it can be inferred this question was asked because ESSIG and his fellow defendants were already contemplating removing Mr. Osgood from command of SVD and demoting him to a position in Staten Island.

98.     In May of 2018, the OIG-NYPD initiated a second investigation into the SVD. The purpose of the second investigation was to do a follow-up investigation on the SVD Adult Squads, to acquire information that NYPD Senior Executives had obstructed the OIG-NYPD from obtaining during the first investigation, and to initiate and investigation on the Division's Child Squads and Registered Sex Offender Unit.  During the next several months Mr. Osgood produced several hundred pages of documents to the OIG-NYPD and gave full disclosure on all aspects in the examined areas.

99.     In May 2018, as had been previously threatened, Mr. Osgood was removed from command of the HCTF out of retaliation for providing truthful testimony to the OIG-NYPD investigation, and not for any proper purpose, given that that he had commanded the HCTF for over sixteen years and was one the leading experts in hate crime investigations in the country.

100.    Further, no one in the NYPD possessed Mr. Osgood's experiential knowledge in this area.

101.    Under Mr. Osgood's command, the HCTF solved every hate crime homicide, gang assault and hundreds of complex hate crime cases and had developed a predictive model for

violent hate crime and used it successfully.

102.    Also, during this period from approximately April through November 2018, Mr. Osgood was shut out by defendant SHEA and others from the sham internal review of SVD, major SVD cases, meetings, and from participating in press briefings and at the behest of defendant MONAHAN, efforts were undertaken to block a favorable news article that was being written about Mr. Osgood.

103.    In October 2018, Mr. Osgood was informed of an off the books meeting held and attended by defendants O'NEILL, DONAHUE, SHEA, and SPINELLA regarding SVD, and an upon information and belief, the retaliatory and otherwise groundless transfer of Mr. Osgood out of SVD command was discussed at the meeting.

104.    Thereafter, on November 15, 2018, Mr. Osgood received a text message from defendant ESSIG stating that the boss, i.e., Chief of Detectives SHEA, wanted to see Mr. Osgood at 1545 hours.

105.    Mr. Osgood met with defendant Chief SHEA on November 15, 2018 and was informed he was losing his Commanding Officer designation, and being demoted to Executive Officer of the Staten Island patrol borough.  The official transfer message issued at 5:00 p.m.

106.    Removing Mr. Osgood from a commanding officer position of an elite detectives division, which offered a promotional path not offered by an executive officer position, was a demotion and a change of status sufficient to constitute an adverse employment action.  Further, this action was undertaken for reasons wholly unrelated to Mr. Osgood's performance as head of SVD and was instead taken in retaliation for Mr. Osgood's protected speech to OIG-NYPD.

107.    On November 16, 2018, Mayor De BLASIO fired the New York City Department of Investigations Commissioner, Mark G. Peters, who was the overall head of OIG-NYPD.

15

108.    After Mr. Osgood was transferred to Staten Island, and Commissioner Peters was fired, based on information and belief, defendants O'NEILL and Mayor De BLASIO's Office were able to stop the second OIG-NYPD investigation of SVD.

109.    Also, after his transfer, a female officer was appointed to replace Mr. Osgood as he had heard was the rumored plan.

110.    The foregoing malicious and retaliatory actions of defendants made Mr. Osgood's working conditions so intolerable, difficult, and unpleasant, that on November 23, 2018, Mr. Osgood felt compelled to go on terminal leave from the NYPD, with the intent of using his paid leave time before officially entering early retirement.

111.    On July 30, 2020, while Mr. Osgood was on terminal leave, having apparently not achieved the desired full ouster of Mr. Osgood, and in a continuing course of retaliatory conduct, Mr. Osgood was ordered into an interrogation by the NYPD's Internal Affairs Bureau on groundless allegations that Mr. Osgood had impermissibly given information to the press.

112.    The interrogation was baseless and designed to further harass Mr. Osgood, notwithstanding that Mr. Osgood had been separated from the NYPD for the preceding twenty-one months while on terminal leave.

113.    After this further act of retaliation, Mr. Osgood forfeited the remaining nineteen months and twenty days of paid leave that he had accrued and was thereby constructively terminated from his employment with the NYPD on August 11, 2020.

**Pattern and Practice of Retaliation – the Blue Wall of Silence**

114.    The aforesaid events were not an isolated incident.  Defendant CITY OF NEW YORK is aware that the NYPD has a long history of suppressing speech by department members about NYPD's failings through harassment and retaliation, through for example other lawsuits

including *Schoolcraft v. City of New York*, 10 Civ. 6005 (RWS); *Floyd v. City of New York,* 08 Civ. 1034 (AT); and *Ariza v. City of New York*, 93 Civ. 5287; and investigations by the Mollen Commission and the Internal Affairs Division of the NYPD.

115.    This "blue wall of silence" enacted by the NYPD has remained so persistent and widespread, despite such notice, that it constitutes the constructive acquiescence of policymakers and constitutes a pattern and practice of the CITY OF NEW YORK and the NYPD.

116.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the CITY OF NEW YORK and the NYPD, all under the supervision of ranking officers of said department.

117.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

### AS AND FOR A FIRST CAUSE OF ACTION
<u>(First Amendment Retaliation under 42 U.S.C. § 1983)</u>

118.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "117" with the same force and effect as if fully set forth herein.

119.    As set forth above, by, among other things, cooperating with and providing testimony to the OIG-NYPD, Mr. Osgood engaged in activity protected by the First Amendment.

120.    Appearing as a witness in a public investigation, as Mr. Osgood did here, is speech that is protected by the First Amendment, and otherwise was engaged in by a Mr. Osgood as a citizen about matters of public concern, to wit: the treatment of sexual assault victims and

child abuse victims by the NYPD.

121.    In retaliation for Mr. Osgood engaging in protected First Amendment speech to the OIG-NYPD, defendants, acting under color of law, intentionally took adverse employment actions against plaintiff including, without limitation, engaging in a course of harassing speech and conduct, removing Mr. Osgood from command of HCTF and SVD, demoting him, and initiating an internal affairs investigation into him designed to further harass Mr. Osgood.

122.    These actions created working conditions so intolerable, difficult, and unpleasant for Mr. Osgood such that he felt compelled to leave the employ of the NYPD and was thereby constructively terminated.

123.    As a result of the foregoing, plaintiff is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
(Municipal Liability under 42 U.S.C. § 1983 against Defendant City of New York)

124.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "123" with the same force and effect as if fully set forth herein.

125.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

126.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and NYPD included, but were not limited to, suppressing speech by

department members about NYPD's failings through harassment and retaliation.

127.    The City of New York also These practices were so persistent and widespread that they constituted the constructive acquiescence of policymakers.  Further, as detailed herein, individual policymakers directly participated in and/or tacitly condoned the retaliation which plaintiff was subjected to.

128.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD constituted deliberate indifference to the constitutional rights of plaintiff.

129.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by plaintiff.

130.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the moving force behind the Constitutional violations suffered by plaintiff.

131.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD, Mr. Osgood was subjected to harassment, demoted, and constructively fired.

132.    As a result of the foregoing, plaintiff is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**WHEREFORE**, plaintiff demands judgment and prays for the following relief, jointly and severally, against the defendants:

(A)     full and fair compensatory damages in an amount to be determined by a jury;

(B)     punitive damages against the individually named defendants in an amount to be determined by a jury;

(C)     reasonable attorneys' fees and the costs and disbursements of this action; and

(D)     such other and further relief as appears just and proper.

Dated: New York, New York
       April 18, 2022

BRETT H. KLEIN, ESQ., PLLC
Attorneys for Plaintiff MICHAEL OSGOOD
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

By:     _Brett Klein_____
        BRETT H. KLEIN (BK4744)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL OSGOOD,

        Plaintiff,

   -against-            21 CV 9460
                   (JPC) (OTW)
CITY OF NEW YORK, BILL DE BLASIO, Individually,
JAMES O'NEILL, Individually, TERENCE MONAHAN,
Individually, DERMOT SHEA, Individually,
ANN PRUNTY, Individually, JOHN DONAHUE, Individually,
JAMES ESSIG, Individually, and RAYMOND SPINELLA,
Individually,

        Defendants.

--------------------------------------------------------------------------------X

## AMENDED COMPLAINT

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132